**C.J. KIRK, et al., Appellants,**

v.

**TEXACO, INC., Texaco Capital, Inc., Texaco Capital N.V., et. al., Appellees.**

**No. 88 Civ. 0671 (CLB).**

United States District Court, S.D. New York, White Plains Division.

Feb. 9, 1988.

---

Milberg, Weiss, Bershad, Specthrie & Lerach by Melvyn I. Weiss, Bernstein, Litowitz, Berger & Grossman by Ronald Litowitz, Wolf, Haldenstein, Adler, Freeman & Herz by Daniel W. Krasner, Eric Levine, Anderson, Russell, Kill & Olick, by Roy Babbitt, Goodkind, Wechsler, LaBaton & Rudoff, by Lawrence A. Sucharow, New York City, Greenfield & Chimicles by Kenneth Jacobsen, Haverford, Pa., for appellants.

Weil, Gotshal & Manges by Harvey Miller, Jeff Friedman, Michael Kessler, New York City, for appellees Texaco, Inc.

Stutman, Treister & Glatt, P.C. by Isaac Pachulski, Los Angeles, Levin, Weintraub & Crames by Myron Trepper, New York City, for appellees Pennzoil Co.

Kramer, Levin, Nesser, Kamin & Frankel by Kenneth H. Eckstein, Joel Zweibel, New York City, for General Creditors' Committee.

Keck, Mahin & Cate by Dennis M. O'Dea, Brian P. Netols, Chicago, Ill., for Committee of Equity Sec. Holders.

Nathan M. Fuchs, New York City for U.S. Sec. & Exchange Comm'n.

BRIEANT, Chief Judge.

Texaco, Inc., together with Texaco Capital, Inc. and Texaco Capital N.V. (collectively "Texaco" or "the debtor"), has a Chapter 11 proceeding pending in this district. On appeal pursuant to an Order to Show Cause granted by this Court on February 1, 1988, and heard and fully submitted on February 4, 1988, certain stockholders of Texaco, Inc.[1] (the "Appellants") seek relief, under Bankruptcy Rule ("B.R.") 8001(b), from the January 29, 1988 order of Bankruptcy Judge Howard Schwartzberg that approved Texaco's Second Amended Disclosure Statement ("the Disclosure Statement") as adequate under § 1125 of the Bankruptcy Code (11 U.S.C. § 1125 (1982 and Supp. 1987)).

This debtor's Chapter 11 corporate reorganization is the largest such filing within our memory. Texaco was formerly the fifth largest American corporation. While some familiarity of the reader with the underlying facts must be assumed, a brief review of the circumstances that brought about this filing may be helpful.

*Background*

On November 19, 1985, after a four-and-a-half month trial, a jury from the 151st Judicial District of Texas announced a verdict of $11.12 billion dollars in favor of Pennzoil for damages in an action against Texaco for tortious interference with a contract, which the jury found that Pennzoil had with various Getty interests and Getty Oil Corporation ("Getty") to acquire part ownership of Getty. Texaco acquired all of Getty in 1986. The award (the "Texas judgment"), which included $7.53 billion in compensatory damages and $3 billion in punitive damages (the latter reduced by the Texas Court of Appeals to $1 billion), as well as prejudgment interest and costs, continues to represent the largest civil judgment in history. *See, Texaco, Inc. v. Pennzoil Co.,* 626 F.Supp. 250 (S.D.N.Y. 1986), 784 F.2d 1133, 1157 (2d Cir.1986), *rev'd, by the Supreme Court,* — U.S. ——, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).

Under Tex.R.Civ.P. 364, a party is required to post a supersedeas bond in excess of the full amount of the judgment in order to be free, pending appeal, from execution of that judgment, or the imposition of a judgment lien. Since the world's total surety bond capacity is less than $1.5 billion, *see, Texaco Inc. v. Pennzoil Co., supra,* 784 F.2d at 1138, Texaco feared that certain errors it alleged in the conduct of the trial, including misapplication of New York State contract and tort law, would go uncorrected, and the company would be forced into bankruptcy or liquidation based on a non-final judgment because it could not obtain a supersedeas. This Court, mindful of the hardship and disruption to Texaco and to large numbers of its employees, dealers, customers and the public that would result from the unnecessary death or dismemberment of one of the nation's largest corporations, and finding a likelihood of success on direct appeal, granted a preliminary injunction on January 10, 1986, preventing Pennzoil from collecting on the judgment or imposing a judgment lien pending appellate finality. Texaco was required to post a bond or pledge security with this Court in the amount of $1 billion, and did so. *Texaco Inc. v. Pennzoil Co.,* 626 F.Supp. 250 (S.D.N.Y.1986). That order was affirmed in substance by the Court of Appeals, 784 F.2d 1133 (2d Cir.1986), but reversed on April 6, 1987 by the Supreme Court, — U.S. ——, 107 S.Ct. 1519, 95 L.Ed.2d 1.

Thereafter, on April 12, 1987, solely in order to gain the benefit of the automatic stay provisions of the Bankruptcy Code § 362, and to prevent Pennzoil from perfecting judgment liens on its property, or collecting the judgment prior to appellate

---

1. C.J. Kirk; Carbide Tool Grinding Service, Inc. Profit Sharing Plan; Leslie Maurer; Thomas Hughes; Etta Steiner; Sarah Steiner; Elizabeth Steiner; Ellen Leslie; and certain other stockholders of Texaco who have identified themselves as the Delaware group.

finality, Texaco, which was otherwise both solvent and profitable, filed a Chapter 11 petition in this Court. On November 2, 1987, the Supreme Court of Texas declined to hear Texaco's writ of error. Texaco applied for and on January 15, 1988 received an extension of the time within which it may petition the United States Supreme Court for a writ of *certiorari* to the Supreme Court of Texas. This extension was sought in the expectation that approval in the Bankruptcy Court of a Plan of Reorganization consented to by Pennzoil would make the petition for *certiorari* unnecessary. Texaco must file for *certiorari*, if at all, by March 31, 1988, a date which cannot be enlarged further by consent of the litigants.

On December 21, 1987, Texaco and Pennzoil filed with Judge Schwartzberg a Joint Plan of Reorganization ("the Plan"), which subsequently was amended twice. Familiarity of the reader with the Second Amended Plan is assumed. In brief, it provides that Texaco will not petition the Supreme Court to review the Texas judgment and Pennzoil's rights as a general creditor will be impaired, in that it will accept a reduction of the Texas judgment from $10.3 billion dollars, plus interest, to $3 billion dollars, to be paid in full on the effective date of the Plan, which must be no later than April 14, 1988.

The Plan also provides for the dismissal of all pending derivative actions by Texaco shareholders arising from the Texas judgment. There are currently 15 such actions pending in various courts, all of which have been stayed since April 12, 1987. These actions allege generally that Texaco officers, directors and other fiduciaries committed negligence or corporate waste in the course of the acquisition of Getty, and by their misconduct or omissions subjected Texaco to being mulcted by the Houston trial jury. Under the Plan, these actions will all be dismissed with prejudice and without costs, and the shareholder plaintiffs acting derivatively on behalf of Texaco will be enjoined from further prosecuting any claims that were or could have been asserted therein. So-called "global releases" for virtually everyone involved in this corporate disaster are provided for in the Plan, and it is agreed that the Texaco directors will be indemnified or reimbursed by the debtor for any liabilities or reasonable legal fees that have arisen or will arise from any claims that were or could have been asserted in the derivative actions. Appellants objected before the Bankruptcy Judge to the Amended Disclosure Statement and were permitted to add to it a "Statement of Plaintiffs in the Stockholder Actions" ("Plaintiffs' Statement"), in which they argued against these features of the Plan.

Headed by a disclaimer to the effect that "none of these statements are agreed to by Texaco or Pennzoil," appellants assert in Plaintiffs' Statement that they believe that the derivative claims are meritorious and constitute valuable assets of the estate worth as much as Texaco must pay to Pennzoil. The argument is made that the "stockholder actions would be based upon the Texas judgment that is final and entitled to full faith and credit," and that the Texas judgment could be used affirmatively under principles of collateral estoppel. Although this Court does not necessarily agree that this offensive use of collateral estoppel will be available against non-parties to the Texas action, especially in light of some of that action's claimed infirmities, this certainly represents a fair statement of the position of the Appellants, which they desire to impart to the Texaco shareholders. It is further pointed out that the derivative actions are being maintained without cost to Texaco on a fully contingent fee basis, and it is asserted that the indemnification provisions of the Plan are invalid as against public policy. It is also observed that some of the individuals or entities named as defendants possess substantial net worth or liability insurance coverage. The Plaintiffs' Statement also identifies at least a potential conflict of interest between Texaco management and the interests of the shareholders.

The Statement makes a strong argument against the wisdom of the Plan. The language therein set forth is essentially that of plaintiffs or their counsel who were in-

vited by the Bankruptcy Judge to provide a written statement to be included in the Second Amended Disclosure Statement. This information is imparted beginning at page thirty-two of the Second Amended Disclosure Statement, while the initial discussion of the releases is found beginning at page twelve. However, there is much relevant and significant disclosure in the pages which follow the Plaintiffs' Statement, so that it is unrealistic to suggest that this statement with which the proponents of the Plan disagree has been isolated or put in an inappropriate position in the presentation, so as to receive less consideration.

The Second Amended Disclosure Statement including the Plaintiffs' Statement, dated January 27, 1988, was approved by Judge Schwartzberg on January 29th, solely as to adequacy of disclosure, and Texaco was authorized to distribute copies to its shareholders. This Court denied a stay, and copies are now being delivered by mail. If two-thirds of the shareholders voting approve the Plan, it will be the subject of a confirmation hearing under § 1129, at which its fairness will be analyzed and ruled upon by the Bankruptcy Judge [2]. Under the Plan, as a practical matter, only the interests of Pennzoil and the Texaco shareholders are impaired.

### Discussion

■ Factual findings of the bankruptcy judge on "core matters" such as the adequacy of disclosure under § 1125(a) should be set aside on appeal by the district court only if those findings represent an abuse of discretion. *In re Snyder,* 56 B.R. 1007, 1009 (N.D.Ind.1986). A judge abuses his discretion by making factual findings that are "clearly erroneous". *See,* Bankruptcy Rule 8013; *In re New England Carpet Co.,* 744 F.2d 16, 17 (2d Cir.1984).

Under § 1125(b) of the Bankruptcy Code, a disclosure statement concerning a plan may not be distributed for consideration unless the supervising bankruptcy judge is satisfied that the statement contains "adequate information", which is defined in § 1125(a)(1) as:

"information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the class."

The issue on appeal is, therefore, was Bankruptcy Judge Schwartzberg's finding that the Second Amended Disclosure Statement contains "adequate information" within the meaning of § 1125(a) clearly erroneous.

■ Appellants assert under these facts that the § 1125 Disclosure Statement should be held to a standard close to that required of a prospectus or a proxy solicitation under the federal securities laws. *See, e.g.,* Securities Exchange Act of 1934 § 14, 15 U.S.C. § 78n (1981 & Supp.1987), and Reg. 14A thereunder. While no reported cases have directly accepted this approach, the Appellants cite to a treatise for authority:

"Securities regulations are a considerable concern in Chapter 11. The closer the case comes to a major reorganization of a widely held debtor, the closer will be the requirement of the disclosure statement to that of a non-bankruptcy prospectus."

D. Cowans, *Cowans Bankruptcy Law and Practice,* § 20.26 (1987). We do not accept this view. Indeed, this Court concludes that under normal circumstances, a disclosure statement need *not* comply with the disclosure standards of the federal securities laws. Section 1125(d) of the Bankruptcy Code provides, "[w]hether a disclosure statement required under subsection (b) of this section contains adequate information is *not* governed by any otherwise applicable nonbankruptcy law, rule, or regulation ..." (emphasis added); *see also, In re A.C.*

---

**2.** Approval of the Plan is possible notwithstanding a negative shareholder vote, under the so-called "cram down" provisions of § 1129(b).

*Williams Co.*, 25 B.R. 173 (N.D.Ohio 1982) (citing § 1125(d)); *In re Stanley Hotel*, 13 B.R. 926, 931 (D.Colo.1981).

It cannot be claimed in the total absence of appellate decisions supporting such a view, that Mr. Cowans' text, quoted *supra*, identifies a legitimate judicial policy favoring analogy to the federal securities laws in complex cases involving large, publicly held corporations, or that such a case invites us to disregard the contrary instructions of Congress found in § 1125(d) of the Bankruptcy Code. Rather, his seems to be merely an academic suggestion, in no way binding on the bankruptcy court in the exercise of its discretion, which need not be accepted when the bankruptcy judge reasonably concludes that less convoluted disclosure than usually found in federal securities law filings, is "adequate".

The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a):

> "Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as [sic] the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection."

H.R.Rep. No. 595, 95th Cong, 1st Sess., 408–409 (1977) U.S.Code Cong. & Admin. News 1978, pp. 5787, 6365. *See also*, Sen. Rep. No. 989, 95th Cong., 2d Sess. 120–121 (1978), quoted *infra* at 684. Indeed, Mr. Cowans himself, a former Bankruptcy Judge, observed that, during the drafting of § 1125, "the S.E.C. and others proposed that large cases with public debt be treated differently. This was plausible but rejected." *Cowans, supra*, § 20.26. On a plain reading of § 1125(a) and (d), the bankruptcy judge is under no duty to analogize to the securities laws even in complex, securities-related bankruptcy cases, and the legislative history does not suggest that any such duty was intended. Congress knew that it could apply the securities laws to certain bankruptcy matters. It declined to require such

application, choosing instead to give bankruptcy judges broad discretion in their supervision of corporate reorganizations. This Court should not undermine this important legislative policy.

Since there is, therefore, no extrinsic statutory standard to which the Appellants can refer in seeking to define "adequacy" under § 1125(a), and no case law dealing with the substance of their objections, they must establish their contention relying on the plain meaning of the statutory language itself, viewed in the light of the underlying facts, or assumed facts, to the extent found by the Bankruptcy Judge to be material to the decision of a reasonable Texaco shareholder whether to vote for or against the Plan. The Appellants have five objections to the Second Amended Disclosure Statement, which have survived the modifications and additions agreed to before Judge Schwartzberg.

Appellants maintain that the Disclosure Statement is inadequate even with their included contribution, the Plaintiffs' Statement, because certain relevant, undisclosed information, discussed below, is available only to the Proponents. The Appellants also claim the Disclosure Statement is deficient because Texaco and Pennzoil disclaim therein any association with the Plaintiffs' Statement. It is necessary, therefore, to determine whether § 1125 is satisfied by the format and content of the Second Amended Disclosure Statement as it now stands, with its separate and contrary assertions.

### Specific objections concerning the Statement

Appellants object to the form or structure of the Disclosure Statement, based on the implicit contention that information disclosed pursuant to § 1125(b) must have the imprimatur of the Plan Proponents in order to be adequate under subdivision (a). This argument necessarily assumes that the prestige of the Texaco name might lend undue support to the views of the proponents, thereby detracting from the force of the separately stated views of the Appel-

lants found in a separate location in this unduly verbose 209 page document[3].

The presence in the Second Amended Disclosure Statement of pertinent information from any credible source would appear sufficient to inform a reasonable shareholder of the existence of the opposing views, as they might affect his or her vote. Whether the Second Amended Disclosure Statement in its current format would in fact so inform a hypothetical, reasonable shareholder may be argued, but it was within the broad discretion of the Bankruptcy Judge to so find. *See,* Sen.Rep. No. 989, 95th Cong., 2d Sess. 120–21 (1978), U.S.Code Cong. & Admin.News 1978, p. 5907. ("Both the kind *and form* of information are left essentially to the judicial discretion of the court") (emphasis supplied).

■ Mistakes or internal inconsistencies in a disclosure statement do not necessarily bar its approval. *See, In re The Stanley Hotel, Inc., supra,* 13 B.R. at 930 (D.Colo. 1981) (internal inconsistencies and even alleged illegalities in plan found not to affect adequacy under § 1125); *see also, In re Hughes Marina,* 16 B.R. 6, 6 B.C.D. 978, 979 (W.D.N.Y.1980) (fact that debtor's predictions as to future were not consistent with tax returns incorporated in the Disclosure Statement did not establish inadequacy). It was not an abuse of discretion for Judge Schwartzberg to find that any omissions or distortions by the Proponents in the Disclosure Statement should, when read along with the Plaintiffs' Statement, alert voting shareholders sufficiently to the Appellants' allegations. No specific proposed additions of Appellants were rejected below.

■ Appellants also claim that the Second Amended Disclosure Statement remains deficient, even if their argument concerning the format is rejected. They claim that the statement fails to inform the shareholders of the fact that "no *independent* investigation or evaluation had been conducted with respect to the value of Texaco's derivative claims." Levine Affidavit, ¶ 17(a) (emphasis in original). This issue is debatable, with its resolution probably turning on the definition of "independent". The Proponents insist that an independent investigation *was* undertaken by the various law firms in Texaco's employ, identified at page 31 of the Disclosure Statement. The Appellants respond that such an investigation was not "independent" under Delaware law, which they contend applies. They have included this view in the Plaintiffs' Statement. *See,* Disclosure Statement at 33.

Appellants may raise at the subsequent confirmation hearing under § 1129, where the fairness of the Plan will be considered, any contention that they have to the effect that a more "independent" investigation is needed. For present purposes, the Plaintiffs' Statement fills whatever disclosure gap may have otherwise existed in the Proponents' comments concerning the derivative claims.

Appellants also assert that the Disclosure Statement does not reveal whether Texaco and Pennzoil would abide by the remaining terms of the Proposed Reorganization if the disputed releases of the derivative claims were not granted. The Disclosure Statement represents that the releases were included in the plan "on the initiative of Pennzoil and the General [Creditors'] Committee," *Id.* at 29. Appellants contend that the Texaco directors, who are defendants in some of the derivative suits, might have been unduly eager to surrender those actions, which the Appellants consider a valuable corporate asset. In support of this assertion, they argue that Pennzoil had no motivation to insist on the releases.

This issue addresses the fairness of the Plan, rather than the adequacy of the notice. Implicit in this argument is the as-

---

**3.** No criticism of the Bankruptcy Court is implied by this comment; it was not the task of Judge Schwartzberg to write a brief, simple and lucid disclosure statement. Rather, it was his duty to rule on objections to a disclosure statement presented by the proponents of the Plan, and drafted, apparently, by lawyers accustomed to drafting documents under the federal securities laws. The Bankruptcy Court sought to resolve the objections by adding more words. This may have been more practical than starting over with a clean slate.

sumption that if the provisions terminating the derivative litigation were disapproved at a fairness hearing, Pennzoil would agree to a Plan by which the Appellants' derivative lawsuits would survive the reorganization. We have no crystal ball with which to determine what any party would do under different circumstances, and we need not reach the issue at this stage. However, the commercial reasonableness of Pennzoil's actions, and that of the General Creditors in seeking the releases, seems readily apparent. The vagaries of litigation and the uncertainty and expense of litigating indefinite claims forever may be considered by responsible directors. *See, e.g., Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed.2d 807 (1966). Nor should we disregard the time pressure that threatens this settlement, which is a legitimate product of the Supreme Court's possible grant or denial of *certiorari,* and of Pennzoil's understandable desire to receive cash in hand promptly in exchange for consenting to the impairment of its claim. The Court believes that Pennzoil management never wants to hear the name of Texaco again—excepting, of course, on the day Texaco's $3 billion check is deposited—and wants to put an end to the entire episode, as do the General Creditors and Texaco management. The releases assure that all litigation relevant to this affair will be put to rest, a result desired by Pennzoil, which might be subject to pre-trial discovery as well as real or fancied claims for contribution on the part of defendants in derivative actions.

■ Assuming a credible factual basis for their objection concerning the release provisions or their origin, the Appellants could not oppose the Disclosure Statement successfully merely by citing its failure to discuss some other possible plan, such as one in which releases would not be given. Section 1125(a)(1), quoted more fully *supra,* provides that, "adequate information need not include such information about

any other possible or proposed plan." *See, In re Brandon Mill Farms, Ltd.,* 37 B.R. 190, 192 (N.D.Ga.1984) ("the disclosure statement is intended to assist the creditors in evaluating the plan on its face rather than to promote a comparison among various proposed plans"); 5 *Collier on Bankruptcy,* ¶ 1125.03[1] and n. 7(g) (15th Ed. 1987) ("a disclosure statement does not have to disclose the existence of other plans or the terms of such plans").

Appellants also assert that the Disclosure Statement is rendered inadequate because the representation that the releases are necessary to the "financeability" (sic) of the Plan is unsupported. This is clearly an expressed opinion, and so presented. Texaco presented this belief not as its own, but as that of Pennzoil and the Creditors' Committee[4]. Attributing the concern over "financeability" to Texaco because it is repeated, with attribution, in the Disclosure Statement would seem questionable. Were we to do so, Appellants could not prevail, because the statement concerning "financeability," whatever that is, represents "a logical conclusion derived from clearly stated facts." *In re Egan,* 33 B.R. 672, 676 (N.D.Ill.1983). We need offer no opinion as to whether Texaco would be making the best possible choice if it sought general releases out of concern for the "financeability" of the Plan; such a concern about uncertain litigation would, in any event, be reasonable. That such a thought process by the proponents of a plan is permissible is clear from the legislative history of § 1125:

"A plan is necessarily predicated on ... factually supported expectations as to the future course of the business.... It may thus be necessary to provide estimates or judgments for that purpose."

Sen.Rep. No. 95–989, 95th Cong., 2d Sess. (1978), *quoted in, In re Egan, supra,* 33 B.R. at 676. *See also,* 5 *Collier on Bankruptcy,* ¶ 1125.03 ("a disclosure statement

**4.** "Texaco is informed that, in these negotiations, both the General Committee and Pennzoil agreed that it was essential to arrive at a full and final disposition of all pending and threatened litigation and controversies which derived from the Getty Oil Transaction or the Pennzoil litigation. The General Committee and Pennzoil believed such a disposition was necessary to the financeability of the Plan." Disclosure Statement, at p. 30.

must contain factual support for any opinions contained therein") (15 Ed.1987).

Rational concerns over the expense and distraction of management efforts caused by pending and possible future litigation may be regarded as reasonably related to the "future course of business", *supra,* and the expectations of the Proponents relating to such concerns may be included in the Disclosure Statement, when the factual basis therefore also is provided.

Appellants next contend that the Disclosure Statement is deficient because it suggests the derivative actions are "unlikely" to succeed, based on Texaco's prior position that there was no binding contract between Pennzoil and Getty. Disclosure Statement, p. 31. Because the Proponents do not suggest the possibility that the Texas judgment could "be used affirmatively against some of the derivative defendants under principles of collateral estoppel", *Id.,* Appellants insist there is insufficient disclosure. As noted earlier, this Court believes there is no basis for applying collateral estoppel offensively against the defendants in the derivative cases. While Texaco may itself be estopped by the Texas judgment after it becomes final, the corporate directors and other fiduciaries were not parties to that action, and could not conceivably have become parties, so they probably are not bound by principles of collateral estoppel. In any event, the contrary opinion of the Appellants on the point is clearly imparted in their statement, and Texaco shareholders may judge for themselves. The inclusion in the Plaintiffs' Statement of the Appellants' views concerning the application of such principles as estoppel, and concerning the ultimate likelihood of success of the derivative lawsuits, readily cures whatever inadequacies would otherwise be created by the Proponents' assertions.

Finally, the Appellants claim that no consideration for the releases is identified by the Disclosure Statement. This argument merely recasts those previously made; clearly, Pennzoil's acceptance of $3 billion under the Reorganization Plan in satisfaction of a judgment of $10.3 billion, plus interest, represents substantial consideration. Only if an otherwise identical plan without the releases would have received the assent of Pennzoil, could an argument be made that there was no consideration. As discussed above, such speculation as to other plans is not required by § 1125. *See, In re Brandon Mill Farms, supra.*

The Appellants' objections to both the form and the substance of the Second Amended Disclosure Statement are held to be without merit. Judge Schwartzberg's determination that the total mix of information contained therein was adequate under § 1125 was not clearly erroneous, and did not represent an abuse of the broad discretion entrusted to the Bankruptcy Court under that section. The order appealed from is affirmed.

So Ordered.